NO. 8246

COURT OF APPEAL

PARISH OF ORLEANS

-----

THOMAS H. KENDALL

versus

AUTOMOBILE SERVICE COMPANY INC.

-----

Court of Appeal
Parish of Orleans
FILED MAY
Stansbury

Dinkelspiel; J.

Plaintiff institutes this suit against the defendant, alleging that he was the owner of a certain automobile touring car; and that on the night of February 28th, 1920, his car collided with a Laurel Street car, with the result same was damaged to such an extent that it could not move any further on its own power, and further alleging that finding this state of facts, he telephoned to defendant company, with a request that they send their mechanics to the scene of the accident, for the purpose of hauling petitioner's car to their garage. Subsequently two mechanics in the employ of defendant, arrived at the scene of the accident, inspected the automobile and plaintiff delivered his car into their keeping and custody and instructed them to take same down to the garage of the defendant company; that the possession of the said automobile was then and there accepted by the agents and employees of the defendant company, who agreed to follow out petitioner's instructions, and petitioner went home. Alleging further that when he delivered said car to the agents and employees of defendant company, his car, excepting the parts broken by the collision, was intact and that all the broken parts, with the exception of the kit of automobile tools and the chains, which plaintiff removed from the automobile and took home for safekeeping, were on the car.

Plaintiff alleges further that defendant did not remove his automobile until the following morning, when he learned that it was still standing at the corner of Laurel and Dufossat Streets and had been robbed of a number of parts during the night. He describes the parts stolen from the machine and the gross negligence and want of care and the axaxx failure to exercise due diligence, allowing his car to remain all night without any protection or gaurds, hence defendants were liable for the property stolen, amounting to

456

$144.80, and praying for judgment for that amount.

The answer admits various articles contained in plaintiff's petition, but denies that plaintiff delivered the car to their agents and employees and denies that same contained the parts claimed by plaintiff and in the Fifteenth Article of defendant's answer, avers that though they had been informed that plaintiff's automobile was waiting to be towed, when they arrived at the scene of the accident, they found it would be necessary to get a "dolly" or truck in order to tow the machine, that they informed plaintiff that they would have to get the dolly from the shop and they were about to remove the parts and/appurtenances ~~appliances~~ from the machine when the plaintiff stated that he, himself, would take charge of same; that respondent's workmen and employees thereupon proceeded back to the shop to get the dolly and left plaintiff's machine, with all its parts and ~~appliances~~ appurtenances in the possession and control of the said plaintiff himself; that if anything was stolen or taken from said machine, it was while same was still under the control and in the custody of the plaintiff and not while respondent was responsible for same; and respondent denies specially, any negligence, responsibility or liability in the premises and prays that plaintiff's suit be dismissed.

Plaintiff is a witness in his own behalf. He testifies substantially, that on February 28th, 1920, after an accident, he called up through the phone, defendant, at about eight fifteen P. M. that night. They sent two men to the place of the accident, who stated they could not move the car without a dolly and they would go back to the shop to get it and would be back in about twenty minutes. He testified further that he took the tool kit and the chains and

457

put them in his friend's car and added "here is my car, take
it down to the shop and keep it until tomorrow morning and
I will advise you what to do with it". The mechanics told
him after an examination of the car that they would have
to return to the shop to get a dolly, because the steering
gear was broken and that they would go back and return in
about twenty minutes. He then told them that he was going
home, he was wet and cold; he testifies that he turned the
car over to them and said "I will take my tire chains and
tool bag" and the rest of the car they left with the me-
chanics.

Q. Did the mechanics take anything from the car themselves?
A. They did not take anything out of the car but they did
take the front tire that had been cut off in the collision
and put it in their wagon and took it down; they did not
say anything about taking anything else down and made no
attempt
/ ~~statement~~ to take anything else.

Q. They were still with the machine when you departed?
A. Yes, they were on the ground picking up this tire when
I turned my back and walked to get into another car and
went home.

Q. When was the next time you heard anything about your
automobile?
A. Seven o'clock the next morning; my mother in law went
to Church and she found my car was still at Laurel and Du-
fossat Streets; I immeidately called up the Automobile Ser-
vice Company and asked why they had not moved the car and
the clerk told me they were then on their way to get it;
I then went down to that place, at about ten o'clock on
Sunday morning and saw the night clerk.

        And substantially further testifying to the con-
versation he had with the latter clerk, the clerk being
asked why he had not moved the car the night before, ~~xxxxxxxxxx~~

replied that one of their trucks had broken down and they had a lot of other jobs to attend to and simply could not get to it. "I then asked why he did not phone me so that I could make other arrangements or watch it myself," and he said he did not know that I had a telephone.

Q. Did he admit to you that he was the man you had spoken to the night before?

A. Yes sir, he said he had talked taken the telephone message and that it was a neglected duty not to bring the car in that night and informed me that they could not get it after I turned the car over to his mechanics.

This witness further testifies describing the condition of his car, that on Sunday Morning, found two cushions and the spare tire on the back, with tube and rim, the headlights and the dash lamp gone; in fact everything detachable was removed. He further testifies that the items missing cost him $144.80 which he paid.

On cross examination:

Q. The two men who came up and examined your car and told you it would be impossible to tow the car without a dolly?

A. Yes.

Q. These men informed you that they would have to go to the shop and get a dolly. Did you or did you not know the length location of the Automobile Service Company shop?

A. I did.

Q. Then I assume you were in a position to judge, were you not, the length of time it would take them on a rainy night, to return to their shop and bring a dolly?

A. Yes.

Q. How long would it take?

A. Thirty minutes. They said they could make it in twenty.

Q. You say that these men picked up a tire which had been torn off in the collision and put it in their service car?

459

A. Yes.

Q. Did or did not you are your other friends instruct them not to remove the cushions?

A. We did not, the cusions were not mentioned?

Q. Did or did not you tell these men you would take charge of the car until they returned from the shop?

A. I did not, I told them I would turn the car over to them; at that time I was xx wet and cold and had a severe cold and I was going home to get out of the wet.

Q. How did you turn over to them?

A. When they come up and said they were from the Automobile Service Company, I said, there is my car, take it down to the shop and keep it and I will come and tell you tomorrow what to do with it; I am going home and I got the bag and the chains.

       This witness in testifying as to/~~whetherxorxnotxhe~~ <sup>why</sup> removed some parts of the car and not others, particularly the tools, was asked by the Court:

Q. Do you mean that you feared the loss of the tools if the car went into the shop?

A. Yes, after it got to the shop; it is not a question of people stealing these tools, but I know how mechanics are, when they repair a car, naturally they pick up the first tools they come to and xx use it and misplace them.

In reference to what instructions the witness gave as to taking charge of his car, the Court asked:

Q. You instructed them to take care of the car, but how they were to do it, you did not know▓

A. No sir.

Q. It was not necessary to remove the tire in order to repair the damage to the car?

A. No sir.

       The next witness who testified, is J. L. Swiller, He was one time a neighbor of the plaintiff and he testified that

he remembered meeting plaintiff on the night of March 20, at the corner of Laurel and Dufossat Streets; his car had been in an accident with the railway car and I went to see what the trouble was.

Q. Were you present with Mr. Kendall when two mechancis from Automobile Service Company came up there?

A. Yes, sir.

Q. Ddd you hear any conversation between Mr. Kendall and those mechanics?

A. Yes.

Q. Relate to the Court what that conversation was?

A. Mr. Kendall phoned the Autòmobile Service Company to come and pull his car in and they came up, they didn't have a dolly, they said they needed a dolly and so both mechanics said they would go to the shop and get a dolly; Mr. Kendall said if they would not bxx be too long he would stay there and they said no and Mr. Kendall took the tool kit and the tire chain and I let him get in my car and they said they would go to the shop and get the dolly and Mr. Kendall put the tool kit and the chains in my car.

Q. Did the mechanics take anything from the car?

A. One tire.

This witness, after describing the situation, was asked this question:

Q. After the conversation with Mr. Kendall, what did these mechanics do.

A. They were both in the Automobile and drove up and Mr. Kendall said the car was there and he asked if they were ready to take the car and they said yes, but they needed a dolly and they said they would go back to the shop and get a dolly; Mr. Kendall said, is there any use of my waiting and they said no, we will get the dolly and come back and get the car, and Mr. Kendall said, I will take my tools and go.

Q. I want to know what they did after this conversation?

A. One sat in the car and the other fellow got out and took the tire that was lying alongside of the car, and put it in the truck.

Q. Where were you when they drove off?

A. Standing right beside them.

Q. Where was Mr. Kendall?

A. Right there.

Q. You are positive of that?

A. Yes.

Q. How long did you stay there after they drove off?

A. We left the same time they did.

He testifies that both the mechanics, witness and plaintiff drove off about the same time, the weather was rainy and cold.

Q. You heard the mechanics tell Mr. Kendall it was no use for him to wait there?

A. Yes, I did.

Plaintiff on being recalled testified:

Q. Was it after the mechanics left the scene of the accident and car, you and Mr. Swiller left?

A. They left after us, they were putting the spare tire which was on the ground, in the car when Mr. Swiller and I went off and got into his car, which was a matter of thirty or forty feet in the rear of the accident; they were both on the ground picking up the spare tire and putting it in their truck.

He testified of his endeavor to have Mr. Dickerson, to whom he had told his troubles, to replace the articles that had been stolen and he refused, stating that he would prefer to believe his mechanics than to believe me. He stated the impossibility of his taking the cushions and other equipment in his friend's car, which was a small

462

Ford; hence did not take anything except what he had testified to.

The main witness for the defendant was Mr. Sondenberg, who testified substantially that he was an automobile mechanic, had been so engaged for about five years, that on the night in question he was employed by the defendant company and that kxxxx he went to the corner of Laurel and Dufossat Streets to look after plaintiff's troubles with his car where he had been ordered to go by the night clerk and described the trouble with the car. A helper by the name of Harkness was with him, and we went and found the car at on the River side of the street; the axel was kxxkxx knocked back and the steering rod was bent. Q. Tell the Court as briefly as you can, just what conversation was had between the owner of the car and yourself? A. I told Mr. Kendall that kx we would have to kx tow the car and we did hot have any dolly and for him to take everything out of the car which could be stolen, to take the extra tire off and he said no, he would attend to everything. Q. Is is or is it not true that Mr. Kendall got into the Ford automobile and drove away while you and Harkness were still on the ground?.
A. No/ sir, Mr. Kendall was there when we left.

The reason this witness gave for not returning with the dolly or xxkxx otherwise, to take back plaintiff's car, was that he did not specify when he would come back, simply told him he would come back.

Q. Did you go back?

A. In the morning about seven o'clock.

Q. What reason, if there was any, caused you to wait until the next morning before going back?

A. It was raining hard all night, we had lots of other service calls around the neighborhood and Mr. Kendall said he

would take everything out of the car and so we did not worry about it.

On cross examination, after describing the distance between witness and Mr. Kendall, the question was asked:

Q. What did Mr. Kendall say to you when you arrived at the scene of the accident?

A. He asked me if we come to take charge of the car and I told him yes.

Q. What did you then tell him?

A. We told him that we could not tow the car and we had to take it on a dolly.

Q. Did you pick up the tire that was lying on the ground?

A. No sir.

Q. Did Harkness?

A. No sir.

Q. Who drove away from the place first?

A. We did.

Q. Did you let Mr. Kendall go away?

A. No sir.

Q. Did you tell Mr. Kendall you would be back in about twenty minutes?

A. No sir.

Q. What time did you go back actually to get that car?

A. About seven o'clock the next morning.

Q. Did you expect Mr. Kendall to stay there all night until you came back?

A. No sir.

By the Court:

Q. Why did you tell Mr. Kendall you would promptly return?

A. We did not specify what time we would return back to the car.

Witness knew the car was on the street and made the report of that fact to his office, did not expect Mr. Kendall to stay

464

there all night long, but he said he was going to take care
of everything or we would have been back right away.

The testimony of Mr. Damonte substantially was that he
was the night salesmanager for the defendant company and it
was his duty to attend to the truck cars, sending them out
on calls; remembers having a call from plaintiff the night
of the accident and that plaintiff notified him, gave him his
license number, that he was in a wreck, had bent the fander,
disabled the car and it could not run, hence witness sent
the mechanics in charge of the tool wagon; he admits that it was it
was between seven and eight o'clock the next morning before
the car was brought into the garage, that the night was
rainy and stormy, he had calls on top of calls, and when
the mechanics came back on that night he sent them out to
attend to other calls that were waiting for service and at
five o'clock on Sunday morning he had sent them to get plain-
tiff's car.

repetition

The other parts of witness's testimony is a
of what had taken place before and the denial of any respon-
sibility.

The witness Mr. W. A. Dickerson, Manager and Principal
Stockholder of the defendant company, knows nothing of the ac-
cident itself.  In a conversation with Mr. Kendall on the fol-
lowing morning, examined the car and plaintiff showed him that
    cushions
the            were gone, the spare tire, head light, and asked
witness what defendant company was going to do about it, and
I told him that we        were not responsible faxxx because
                   to do the business
we were not engaged and perfectly clear of all blame.  His
information in reference to the entire matter was what he
got from Mr. Damonte, otherwise knew nothing at all about the
matter except as to the value of the articles lost.

The deposition of  D. Harkness, substantially states
that he was a mechanic's helper at the time stated, in the

465

employ of the defendant company and that he was ordered by Mr. Damonte, the night clerk, to accompany Mr. Sonderberg, the other witness, on the night of February 28th, 1920, to go after plaintiff's car; it was a very bad night, it was raining, the wind was blowing very hard, the accident to plaintiff's machine was that it was run into a street car and the machine was badly damaged. He testifies further they ~~kxxadxkhkxxaazxkxkaxkafsmdxmkkxxshaqxkxmdxxa~~ started to remove the valuables, including the cushions, tools and spare tires, as we had been instructed to do in all cases, but the owner of the car objected to our taking the valuables and stated that he had a friend living near by and he would take them to this friend's home, which he did, or at least he did not allow us to take ~~kak~~ them to ~~khsgxxaga~~ the garage.

We have thus quoted the main portions of the testimony in this case and the question presented to this Court is whether under the circumstances and all the facts in this case, defendant can or cannot be held responsible for the loss of plaintiff's property.

The testimony as in all similar cases is conflicting and as frequently decided by the Supreme Court and this Court in such contingencies, when questions of fact are purely involved and the credibility of the witnesses must be inquired into, the judgment of the lower Court will be affirmed, unless manifestly erroneous.

> Martinez vs. Fabacher, 118 La. 955;
> Williams vs. R. R. Co. 121 La. 438;
> Basile vs. Taranto, 124 La. 677;
> Art. 3003 Civil Code.

"The attorney is responsible, not only for unfaithfulness in his management, but also for his fault or neglect.

Nevertheless, the responsibility with respect to faults, is enforced less rigorously against the mandatary acting ~~gxxkxkxmkx~~ gratuitously, than against him who receives a reward."

It is proven and not denied that on the night in question, as stated in plaintiff's petition, plaintiff met with an accident to his automobile, and ~~finki~~ finding it impossible to use the machine, stopped at the ~~pkxaad~~ place mentioned and phoned to defendant company to take charge of his automobile; ~~andxkkxaxx~~ to send for same, which defendant answered and sent two of its men to plaintiff's assistance. After an examination of this car, they found it so badly injured that it could not be moved without the aid of a dolly, hence, being informed of this fact and being told by these men in the defendant's employ, that they would return and bring the dolly in order to take this automobile back to their shop, plaintiff contends that taking out his tools and some other portions of loose material, he left his car in the hands of defendant's employees and whilst the men were gathering up and taking into their possession, the tire which was on the street, plaintiff and his friend, in the Ford car belonging to the latter, returned to his home, believing , as he had a right to do, that the car was in the possession of the defendant company, who would return for it as soon as they could come back with the dolly. There were two men, either one of whom could and should have remained with this car until the dolly was brought; they did not see fit to do so, they possibly believing that plaintiff would remain,whilst he positively asserts and testifies that he was suffering from a very bad cold, that it was a rainy and cold night and he having left his automobile with these people, with his friend, went home.

The Company is next heard of after plaintiff had been notified that his car was standing just where he left it, he immediately phoned to the defendant company, who after this message, sent their men back to the scene of the accident

and removed the car to its garage. In the meantime the property described in plaintiff's petition had been stolen, when, no one knows, no one has testified, the car remaining in the street all night without gaurd or care-taker, it does prove that defendent was negligent in not having sent for the car and during the time that the car stood on the street unprotected during the night, while one of the men employed by the defendant could easily have remained until the other returned, and that being what they were employed for, would make defendant responsible.

The taking of possession by the defendent of the tire, which is not denied, proves that they intended to return with the dolly to get plaintiff's automobile. Else why take possession of the tire if they did not intend to do the other portion of the work?

The answer speaks for itself.

The property could and should have been taken care of by the defendant company; they did not do so; hence, the loss must fall on them.

"The true measure of liability is that the bailee is bound to that degree of diligence which the manner and the nature of his employment make it reasonable to expect of him and that anything less than this is culpable in him."

6th Corpus Juris, 1118, Sec. 57.

In the supplemental brief filed by the appellant in this case, we are referred to the case of Armistead versus the Shreveport and Red River Railroad Co., 108 La. p. 171, as determinative of the present case.

In that case there was evidently a deliberate abandonment of the merchandise, hence the judgment was rendered on that particular point.

In xhix the case at Bar, if under the xixxmmxxgmxxx evidence, plaintiff abandoned his property deliberately,

468

leaving it in the street, possibly the decision in the Armistead case would apply. But we are not inclined to that view. We believe, as stated in this opinion, that the evidence satisfied the Judge of the Court aquo that possession had been given by this plaintiff to the defendant and the automobile in question, therefore, was not abandoned. The whole question is one of fact and as we have stated the Judge of the lower Court had a better and clearer view of the matter than we have.

For the reasons assigned, it is ordered, adjudged and decreed, that the judgment of the Court aquo is hereby affirmed, costs of both Courts to be paid by the defendant.

*Judgment affirmed*